# **EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X
SMITHLINE FAMILY TRUST II, as                           :
      Assignee of Puritan Partners LLC,
                                              :      Index No.:
             Plaintiff,
                                            :
      - against -
                                            :      **SUMMONS**
FOXO TECHNOLOGIES, INC., a Delaware
Corporation, and JON SABES,                             :

             Defendants.                           :
-----------------------------------------------------------------X

TO THE ABOVE NAMED DEFENDANTS:


      You are hereby summoned to answer the attached Verified Complaint in this action and

to serve a copy of your answer on the Plaintiff within twenty (20) days after the service of this

summons, exclusive of the day of service; or within thirty (30) days after the service is complete

if this summons is not personally delivered to you within the State of New York; and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the attached Verified Complaint.

      The basis of venue in this action is that, pursuant to a Securities Purchase Agreement

dated January 25, 2021, the parties hereto submitted themselves to the laws of the State of New

York with exclusive general jurisdiction in the courts of the State of New York, Borough of

Manhattan.

Dated: New York, New York
November 18, 2022

SICHENZIA ROSS FERENCE LLP

By: ___/s/ Sameer Rastogi_____
   Sameer Rastogi, Esq.
   Owen A. Kloter, Esq.
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
(212) 930-9700

*Attorneys for Plaintiff Smithline Family Trust II, as*
*Assignee of Puritan Partners, LLC*

TO:

  FOXO Technologies, Inc.
  c/o Corporation Service Company
  Registered Agent
  251 Little Falls Drive
  Wilmington, Delaware 19808

  Jon R. Sabes
  663 Bushaway Road
  Wayzata, Minnesota 55391-1913

  Jon R. Sabes
  1904 Arthur Lane
  Austin, Texas 78704-3234

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

SMITHLINE FAMILY TRUST II, as                    :
     Assignee of Puritan Partners LLC,

                                 :    Index No.:

          Plaintiff,

                                 :

     - against -

                                 :    **VERIFIED COMPLAINT**

FOXO TECHNOLOGIES, INC., a Delaware              :
Corporation, and JON SABES,                      :

          Defendants.                          :

-------------------------------------------------------------X

        Plaintiff Smithline Family Trust II, as Assignee of Puritan Partners LLC ("Smithline" or

"Plaintiff"), by and through its attorneys Sichenzia Ross Ference LLP, as and for its Verified

Complaint against FOXO Technologies, Inc. ("FOXO") and Jon Sabes, the recently terminated

CEO and former Chairman of the Board of FOXO ("Sabes," collectively with FOXO,

"Defendants"), alleges as follows:

### PRELIMINARY STATEMENT

        1.     This action concerns the intentional, willful, and malicious manipulation and

misrepresentation and omission of critical material information, deliberately concealed

wrongdoing that should have been disclosed to investors, inside deals and favors that represented

conflicts of interest to conflicted parties. Desperate, for various self-serving reasons, for a

transaction to be consummated at all costs, Defendants and their cohorts deliberately disregarded

the terms of investors' interests in contravention of their investment documents. The end result

of these acts and omissions caused significant harm to the investors.

        2.     All of these acts and omissions occurred in the context of a debenture and warrant

investment and subsequent merger of FOXO with a special purpose acquisition company

Case 1:22-cv-10858-VEC   Document 1-1   Filed 12/23/22   Page 5 of 32

("SPAC") called Delwinds Insurance Acquisition Corp. ("Delwinds"), which were orchestrated by FOXO's then Chairman of the Board and CEO Jon Sabes, an individual whose prior company was already under investigation for financial misdeeds committed during his tenure as Chairman of the Board and CEO of that company, which investigation was undisclosed to FOXO investors, including Smithline.

3.        When the proverbial music stopped at the end of Sabes's performance, FOXO's investors had lost millions of dollars, its stock price has and continues to crater, its debenture holders were never repaid nor were their warrants repurchased as required by the transaction documents, its investment bankers and financing providers terminated their relationships with the Company, and Sabes and his cohorts received millions of dollars in a purported management share plan, bloated "consulting fee" payments and stock, and consideration for financings they did not perform, all at the expense of FOXO's investors.

## PARTIES

4.        Plaintiff Smithline is, and at all times relevant herein was, a Grantor Trust organized and existing under the laws of the State of New York.

5.        Upon information and belief, defendant FOXO Technologies, Inc. is a corporation organized under the laws of the State of Delaware.

6.        Defendant Sabes is an individual, who at times relevant herein was CEO and Chairman of the Board of FOXO, until being terminated by the Company as CEO and Chairman of the Board effective as of November 14, 2022, after which time he remains a Director of FOXO.

Case 1:22-cv-10858-VEC Document 1-1 Filed 12/23/22 Page 6 of 32

## JURISDICTION AND VENUE

7.     Pursuant to a Securities Purchase Agreement ("SPA"), dated January 25, 2021,

and an accompanying 12.5% Original Issue Discount Convertible Debenture, due February 23,

2022, and Warrant to purchase, initially, up to 312,500 shares of FOXO common stock until

February 23, 2024 (collectively, including the other documents entered into in connection

therewith, the "Financing Documents"), both Smithline and FOXO submitted themselves to the

laws of the State of New York with exclusive general jurisdiction in the courts of the State of

New York, Borough of Manhattan.

## FACTUAL BACKGROUND

### Puritan Partners LLC and FOXO Enter into the Financing Documents

8.     Joseph Gunnar & Co. LLC, a broker-dealer in New York, New York ("JGUN"),

acting as FOXO's investment banker, initially approached Smithline and other investors in

January 2021, about investing in FOXO.  JGUN arranged all of the financing under the

Financing Documents, as well as other financings from time to time for FOXO during the period

in question.  On or about January 25, 2021, Puritan Partners LLC ("Puritan") entered into the

SPA with FOXO.  Under the terms of the SPA, Puritan purchased debentures and warrants from

FOXO for $1,000,000.

9.     Pursuant to the SPA, and in consideration for its investment, Puritan received a

12.5% Original Issue Discount Secured Convertible Debenture due February 23, 2022 (the

"Debenture") in the principal amount of $1,125,000, and a warrant to purchase initially up to

312,500 shares of FOXO's common stock until February 23, 2024 (the "Warrant").

10.     The Warrant provided for an exercise price of the lesser of (i) the original issue

price under FOXO's Certificate of Incorporation, or (ii) in the event that a qualified offering was

consummated prior to the exercise, the qualified offering price, subject to all adjustments thereunder.

11.     Upon information and belief, the original issue price, as later disclosed in public filings, was $3.61 per share.

12.     Section 3.1(j) of the SPA provided that FOXO, its subsidiaries, officers, and directors, were not and had not been the subject of any securities law or breach of fiduciary duty claims, were not being investigated by the United States Securities and Exchange Commission ("SEC"), nor has there been or is any investigation involving the Company or any such party.

13.     Section 5(b) of the Debenture (as well as Section 3(b) of the Warrant) provided that if, at any time while the Debenture is outstanding, FOXO or any subsidiary sells or grants any option to purchase any of FOXO's common stock at a price per share that is lower than the then conversion price (or, in the case of the Warrant, the exercise price), the Company must notify the existing holders (including Smithline), reduce the conversion price of the existing Debenture (or, in the case of the Warrant, the exercise price) to the dilutive price and the Debenture holders and Warrant holders would be entitled to receive additional shares at the dilutive price upon conversion of their Debentures or exercise of their Warrants.

14.     In addition, the SPA provided for the delivery of a Lock-Up Agreement, to prevent the original Debenture investors, such as Smithline, from selling their FOXO shares received upon conversion of their Debentures or exercise of their Warrants commencing on the closing date of any qualified offering and continuing for one hundred eighty (180) days thereafter.

15.     Pursuant to a model of FOXO's projected financial results given to investors, including Smithline, in conjunction with their investment in FOXO, FOXO's five-year

Case 1:22-cv-10858-VEC   Document 1-1   Filed 12/23/22   Page 8 of 32

projections provided for a growth in its revenues from $873,069 in 2021 to an impressive $4,766,825,407 for the year ending December 31, 2025. The figures provided in the model were significantly more aggressive than other financial information that was later provided to Smithline and other investors, including financial information provided to investors in the subsequent SPAC transaction.

16.     On or about October 1, 2021, Puritan assigned the Debenture and Warrant to Smithline Family Trust II.

17.     As will become apparent from the additional facts that follow, FOXO breached the Financing Documents in multiple ways, made numerous misrepresentations and omissions of material fact, and undermined its investors for the benefit of its executives, insiders, purported "consultants" as well as the sponsor of the SPAC, including Andrew Poole, Chairman and CEO of Delwinds, with which FOXO ultimately merged. Poole's dealings with Sabes enabled Sabes to massively dilute FOXO's shareholders while saving the sponsor group's $6,325,000 investment in Delwinds, which it would have lost had it not been able to merge Delwinds with FOXO.

**The Memorandum and Amendment**

18.     Approximately a year after the sale of the Debentures, on January 17, 2022, Sabes sent Richard Smithline, Smithline's authorized representative, a memorandum entitled "FOXO Updates and Amendment" to FOXO Bridge Financing Investor (the "Memo").

19.     In the Memo, Sabes explained that he was seeking to amend the SPA to aid in FOXO's efforts to complete a business combination with a SPAC. Sabes claimed that the SPAC would increase FOXO's value, providing the original investors, such as Smithline, with: (1) an approximate 2.5 times return on their debenture investment, (2) warrants which will be

Case 1:22-cv-10858-VEC   Document 1-1   Filed 12/23/22   Page 9 of 32

approximately $6.00 per share in the money, and (3) $18.00 per share in total consideration

providing investors with an approximate 5 times return in approximately 18 months.  He further

stated in the Memo "[w]hat is exciting about our proposed transaction is that the SPAC sponsor

*is* strategic**,** bringing value beyond just capital, and while FOXO will be valued at a significant

increase from the Bridge Financing, our valuation is reasonable given the exciting future growth

opportunity we have."

20.     Although the Memo presented the opportunity for FOXO to merge into a SPAC

as a benefit for Smithline and other investors, Sabes had a pernicious ulterior motive by which he

intended to extract the majority of the economics of the transaction for his own and his cohorts'

benefit, while leaving FOXO's investors, such as Smithline, holding the proverbial bag.

21.     Specifically, the Memo failed to disclose that the SPAC transaction included a

$100,000,000 management share plan (an unheard of 50% of the consideration given to FOXO

shareholders in the transaction) which would benefit Sabes and his cohorts at the expense of

FOXO's investors.  The Memo also failed to mention that the shares underlying a second

debenture offering issued by FOXO to fund the transaction would not be subject to a lock up

agreement, as the initial Debenture shares were to be, to the direct and distinct disadvantage of

the original Debenture investors, including Smithline.  Moreover, the Memo failed to disclose

that the SPAC (through its sponsor group) would not be required to deliver in excess of $10

million of capital to the transaction despite the SPAC's having $201 million in trust at that time.

Further, the Memo omitted any reference to the ongoing SEC investigation and litigation

regarding Sabes' prior company during his tenure as Chairman and CEO of GWG Holdings,

events that would be publicly disclosed later in a June 24, 2022 article in the *Wall Street Journal*

and the proxy statement and prospectus for the SPAC merger.

- 6 -

22. Shortly thereafter, FOXO's investment banker, JGUN sent Smithline an Amendment Agreement (the "Amendment") seeking the consent of 50.01% of the original Debenture investors for a variety of amendments to the Financing Documents.

23. The proposed Amendment included, with respect to the Debentures:

a. Consummating the merger with the SPAC by modifying the term of a qualified offering.

b. Allowing FOXO to incur additional indebtedness (*i.e.*, the second debenture offering).

c. Amending the definitions of "prepayment amount", "final extension amount", "SPAC transaction amount" and "SPAC transaction date".

d. Extending the maturity date of the original Debentures.

e. Modifying what constituted an Event of Default under the Debentures.

24. The Amendment also sought the following with respect to the Warrants:

a. Modifying the exercise price.

b. Modifying the definition of a Fundamental Transaction so as not to require the purchase of the Warrants in conjunction with the merger of FOXO with and into the SPAC.

25. If the amendments were not approved by 50.01% of the Debenture investors, (i) the Debenture holders would not have been required to convert their Debentures into shares of the surviving corporation of the merger, (ii) the incurrence of the indebtedness to finance the transaction would have constituted an Event of Default under the Debentures causing the Debentures to be immediately due and payable at the Mandatory Default Amount (*i.e.*, the sum of (a) 130% of the outstanding principal amount of this Debenture, plus (b) 130% of accrued and

unpaid interest hereon and (c) 130% of all other amounts, costs, expenses and liquidated damages due in respect of the Debenture), (iii) the interest rate on the Debenture would have increased to 18% , (iv) 18% late fees would begin to accrue  under the Debentures,  (v) FOXO would have been required to buy back the Warrants from the Debenture and Warrant investors at the Black Scholes Value (as defined in the Warrant) thereof, a value to Smithline in excess of several million dollars (*i.e.*, $2,406,731, without giving effect to the dilutive issuance, or $3,168,750, with giving effect to the dilutive issuance's impact on the exercise price of the warrants, but not giving effect to the increase in the number of warrant shares in the anti-dilution provisions of the Warrant) and (vi) the shares underlying the Debentures and the Warrants would not have been subject to a lock-up after the merger with the SPAC as such transaction would not have constituted as a Qualified Offering.

26.     JGUN, which was in the position of both negotiating the terms of the amendment with FOXO on behalf of its investors and soliciting the consent to the amendment on behalf of FOXO, was not initially successful in getting the required 50.01% consent to approve the Amendment.

27.     As a result, Sabes wrested control of the transaction from JGUN and covertly and directly solicited the Debenture investors, including Smithline, on different terms.  Sabes implied to Smithline such Amendment had been approved by JGUN on behalf of its clients but did not disclose certain material facts to Smithline or other investors.  Based on these misrepresentations by Sabes, Smithline and more than 50.01% of the other Debenture investors approved the Amendment.  Smithline signed the Amendment as between itself and FOXO without knowing that material facts were not disclosed in conjunction with Sabes soliciting the Amendment.

28.     JGUN's President criticized Sabes's rogue efforts by stating, in writing, that the consent solicitation was done "covertly and directly" by Sabes as JGUN would not endorse the Amendment without the release of the lock-up agreement on the initial Debenture investors. According to JGUN, Sabes had reneged on his agreement to remove the lock-up for the initial Debenture investors so he sent his own amendment version to investors without JGUN's endorsement.  JGUN further stated of Sabes: "his attempt to now self-direct a second bridge [financing] offering ex-JGUN is a reflection of the unfortunate friction caused by me calling him out on his bad faith dealing."  Denying that it knew about the management share plan, JGUN concluded "his behavior pattern is bs [*sic*]."

29.     Under direct questioning by Smithline as to the terms of the SPAC transaction, Sabes focused on the 5 times return investors were supposed to receive on their investment. Sabes refused to disclose the terms of the merger, including a $100,000,000 share plan, which amounted to a share grant to himself and his management and consultant cohorts of 50% of the total consideration to be received by FOXO shareholders, on a $200,000,000 total transaction consideration.  It was later learned through public filings, that Sabes was personally granted over 35% of such plan shares (*i.e.*, 3,507,000 shares at approximately $10.14/share) valued at $35,560,980 at the time of grant.

30.     Sabes also failed to disclose that the subsequent investors would not have their shares subject to a lock-up agreement.  He also failed to advise Smithline that the SPAC (which initially had $201,000,000 in trust) was not required to deliver such cash to the merged company. Rather, and unbeknownst to Smithline, only a paltry $10,000,000 had been committed to be delivered by the SPAC sponsor group.

31.     Once again, Sabes also failed to disclose the ongoing SEC investigation and litigation relating to his tenure at GWG Holdings.

32.     The SPAC was announced on February 24, 2022.  Smithline did not become aware of any of the foregoing information until the SPAC transaction was publicly announced. These were intentional, willful, and material omissions and misrepresentations by Sabes, the then Chairman of the Board and CEO of FOXO, but for which Smithline, and likely other investors, would not have approved and signed the Amendment.

33.     After the announcement, it became clear that the reason Sabes was able to negotiate for himself (and his cohorts) such an attractive deal with Delwinds was because Delwinds was not committing to delivering financing, other than its sponsors' relatively minimal commitment to invest an additional $10,000,000 in the transaction at its closing if there was not $10,000,000 in the trust at such time. Notably, Delwinds was approaching its expiration date at which time its sponsor group would have had to redeem the trust and give the money back to shareholders and lose their investment in Delwinds, putting the sponsor group's $6,325,000 investment in Delwinds at risk of complete loss.

**FOXO's Post-SPAC Announcement Misconduct**

34.     In July 2022, Smithline learned, from Delwinds Form 8-K, that FOXO would be permitted to pay $1,425,000 million in cash as well as issue 1,500,000 shares of FOXO Class A common stock to an existing stockholder, Bespoke Growth Partners, Inc. ("Bespoke"), as consideration for certain alleged services, *e.g.*, "advisory services relating to the implementation and completion of an event that will result in the Company being publicly listed and subject to Exchange Act" despite the subject transaction being very close to completion at the time.

35. Based on the receipt of such shares, Bespoke became, according to the proxy statement and prospectus, a Related Party to FOXO and resulted in certain disclosures, which were legally required to be made in the proxy statement and prospectus. Although Smithline questioned FOXO, FOXO's counsel, Andrew Poole and SPAC counsel about such disclosure, these disclosures were not made by either FOXO or Delwinds in their respective public filings. Upon information and belief, making such disclosures would have risked (i) further delay in the SPAC transaction that at that time had been cleared by the SEC, (ii) potentially increased scrutiny by the SEC of the deal, and (iii) the need to obtain a new consent from Debenture investors, including Smithline, who with knowledge of these previously undisclosed facts would almost certainly not have given such consent as previously provided.

36. Bespoke's principal, Mark Peiken ("Peiken"), advised Smithline that he had acted as special counsel to FOXO's attorneys, Mitchell Silberberg & Knupp, LLP ("MSK"), and had fee sharing arrangements with the law firm. This potential conflict of interest, along with litigation relating to one of Bespoke's principals, should have been disclosed to investors in the proxy statement and prospectus. Just prior to the closing of the SPAC merger, Sabes arranged to pay Bespoke's astronomical fee of $8,500,000, comprised of $1,425,000 in cash and 1,500,000 shares of FOXO common stock. Based on the terms of the Debenture and the Warrant, the issuance of shares to Bespoke was a dilutive issuance and should have decreased the conversion price of the Debentures and the exercise price of the Warrants and increased the number of shares to be received by holders upon exercise of the Warrants. However, had FOXO abided by the terms and protections in the Financing Documents and recognized such dilutive issuance, it would have severely diluted the shares of Sabes and his cohorts, including Andrew Poole and Peiken, and could have potentially derailed the merger with Delwinds.

37.     Neither FOXO nor its attorneys sent the required notice of this dilutive issuance to Smithline (or, upon information and belief, other Debenture or Warrant holders).  FOXO also refused to provide details of other potentially dilutive issuances when requested multiple times by Smithline.

38.     On behalf of FOXO, MSK opined that the issuance of shares to Bespoke was not dilutive, while at the same time, failed to disclose Peiken's relationship with MSK or other material items required to be disclosed in the proxy statement and prospectus.  Delwinds also failed to make such required disclosures in the proxy statement or prospectus relating to the SPAC merger.

39.     The Bespoke giveaway, upon information and belief, was memorialized in a "consulting agreement" that was not publicly disclosed in the proxy statement or prospectus relating to the SPAC merger.  Therefore, it is unclear if the shares given to Bespoke were, or were not, encumbered by a lock-up agreement enabling Bespoke to exit the share grant while other investors, like Smithline, would still be prohibited from selling their shares.

40.     Sections 5(b) of the Debenture and Section 3(b) of the Warrant, each contain anti-dilution provisions prohibiting such dilutive issuances, and require that, if such issuances are made by FOXO, the conversion price of the Debenture and the exercise price on the Warrants must be reduced to the price of the dilutive issuances and the number of warrant shares to be received by holders on exercise of the Warrants would be increased.

41.     The share giveaway to Bespoke constituted a dilutive issuance under the Debenture and the Warrant.  Although Smithline repeatedly raised this issue to Sabes and other members of FOXO management, FOXO's attorneys, the SPAC sponsor, Andrew Poole, and to SPAC counsel, FOXO improperly refused to acknowledge it, or to take the action required of it

- 12 -

under those agreements.  Namely, FOXO was obligated to reduce the conversion share price on

the Debenture and the exercise price of the Warrant, and increase the number of warrant shares

to be received by holders on exercise of the Warrants, which would have required FOXO to issue

them additional shares at that price upon conversion of the Debentures or exercise of the

Warrants.

42.     Acknowledging that the Bespoke fee was, in part, a dilutive issuance would have

significantly diluted the share holdings of Sabes and his cohorts, including Bespoke and Andrew

Poole and the other members of the sponsor group of Delwinds, which would have made the

consummation of the SPAC transaction for all intents and purposes impossible.

43.     Around the same time, based on a June 24, 2022 *Wall Street Journal* article,

Smithline further learned for the first time that FOXO had made misrepresentations about

litigation and SEC investigations involving its officers and directors.  The *Journal* article stated,

Sabes' prior company GWG Holdings was subject to an SEC investigation and lawsuits from

investors based on breaches of fiduciary duty and fraud for activities taking place during Sabes'

tenure as Chairman and CEO of GWG Holdings.  It was stated in the article that "many investors

were unaware that as its core life-settlement business failed, GWG Holdings would transfer

hundreds of millions of dollars into startup ventures created by the company's former leaders",

including Sabes.  The SEC investigation had been ongoing since October 2020, in other words,

before Puritan entered into the SPA with FOXO that represented that no such investigation

involving any of its officers or directors is or was ongoing, a representation that was maintained

by Sabes and FOXO.  Finally, Delwinds' proxy statement and prospectus also disclosed the

litigation relating to GWG Holdings for activities which took place during Sabes' tenure as

Chairman and CEO.  JGUN and Peiken advised Smithline that there was much consideration

- 13 -

given to replacing Sabes as CEO of FOXO at such time due to his conduct, especially in light of FOXO's operating in the heavily regulated insurance industry and having insurance companies as investors, but it was ultimately decided not to replace him at such time.

44.     By September 2022, Smithline learned from Peiken that the SPAC investors largely intended to redeem their money from the SPAC's trust and not invest in the transaction.

45.     Making matters worse, although they had been touted as the financial advisors to FOXO and Delwinds, two major investment banks, RBC Capital Markets and Deutsche Bank, on June 8, 2022 and June 16, 2022, respectively, walked away from the SPAC deal before it closed, despite having completed their work, foregoing $12,600,000 in fees.  The proxy statement and prospectus disclosed that neither RBC Capital Markets nor Deutsche Bank wanted their names and reputations associated with the disclosures (or lack thereof) or the underlying business analysis relating to the transactions used to pitch to investors such as Smithline.  It should be noted that despite the robust projections being used to solicit investors, FOXO had recorded revenues of a paltry $79,000 for the first half of 2022.  The $79,000 of revenues during this period was a far cry from the $150,000,000 of revenues that FOXO had projected to investors in connection with the SPAC transaction that it would generate for 2023.  Smithline emailed to FOXO, its counsel, Andrew Poole and SPAC counsel, and informed them that it appeared that the economic interests of the remaining participants completing the transaction trumped the concerns mentioned by RBC Capital Markets and Deutsche Bank regarding FOXO's disclosures (or lack thereof) or the underlying analysis relating to the transaction.

46.     After RBC Capital Markets and Deutsche Bank backed away from the deal, JGUN, the sole remaining investment bank involved, and which was acting on behalf of FOXO, then approached Smithline soliciting further investment into FOXO in exchange for removing

the lock-up on the original shares underlying the Debentures and Warrants. As the Amendment had not been properly obtained, such lock-up should not have applied to Smithline and the other investors in the initial Debenture round in any event. That the primary sales incentive of this capital raise was to eliminate the lock-up on the prior investment, was an indication that FOXO—despite public pronouncements to the contrary by its CEO and Board members—knew the value of its shares would imminently plummet and were thus collecting ransom from its early investors for something they should have otherwise had already (i.e., the rights to sell their shares) before the stock price collapsed.

47.    Smithline did not participate in this additional financing.

48.    Around the same time, Smithline's representatives met with Peiken, FOXO's "consultant" at the Westchester, New York airport, and Peiken admitted that Sabes had been untruthful and had been negotiating against the Company's interest for his own benefit in orchestrating the SPAC deal. Peiken stated that he was "terribly sorry for all of this sh*t we had to deal with here." He noted that he was uncomfortable with Sabes' lack of veracity, stating "Jon seems to have a problem with the truth." Peiken explained that he would not have invested $1,500,000 into FOXO had he known about the litigation involving Sabes at the time of the investment, and that he understood that Smithline's representatives had "significant concerns". He also mentioned that SPAC counsel was concerned as to whether the answers to the questions Smithline's representatives had raised would have to be disclosed in the proxy statement and prospectus, which had already been declared effective. Making such disclosures could have delayed and possibly derailed the transaction.

49.    In the course of their discussions, Peiken, told Smithline's representatives that he held freely tradable shares that were not subject to a lock-up agreement, and tried to convince

Smithline's representatives that the investment banks had resigned as a courtesy to save fees because they owed the SPAC's principals a favor from another deal.  In addition, as compensation for the wrongdoing they had suffered, Peiken offered R. Smithline's son a seat on FOXO's Board of Directors, and offered Smithline's representatives a consulting agreement from FOXO or some of Peiken's free-trading stock.  Smithline's representatives rejected these proposals.

50.     Meanwhile, shortly before the closing of the merger, on September 13, 2022, Delwinds entered into a forward purchase agreement whereby Meteora Capital Partners, LP ("Meteora") would purchase up to 3,000,000 shares of its common stock in the market and sell them to FOXO with its returns guaranteed by funds (*i.e.*, $29,135,330) of FOXO held in escrow.

51.     The result of this agreement allowed the SPAC's sponsors, Andrew Poole and his colleagues, at the significant expense of FOXO and its shareholders, to avoid making further investment in FOXO, which they had otherwise been required to make when 99.5% of SPAC shareholders redeemed their shares and $10,000,000 was not left in trust in the SPAC.  Andrew Poole and his colleagues later entered into another self-serving agreement with FOXO to release their locked-up shares earlier than originally contemplated. Yet the message given by Andrew Poole to the public in a FOXO press release dated September 16, 2022 was different: "[h]aving had the opportunity to work closely with the FOXO team these past months, our belief in FOXO's value proposition and market opportunity have only grown."

52.     FOXO and Delwinds consummated its merger on September 15, 2022, and shares of the merged company began trading under the symbol "FOXO" on the NYSE American on September 16, 2022.

53.     On November 11, 2022, Meteora and the Company "mutually terminated" the forward purchase agreement, upon which Meteora was allowed to retain 500,000 shares of common stock and the escrow agreement was terminated, further damaging investors.

54.     Another of the Company's financing parties, CF Principal Investments LLC (the "Cantor Investor"), an affiliate of Cantor Fitzgerald & Co., "mutually terminated" its common stock purchase agreement with the Company, pursuant to which the Company had the right to sell to the Cantor Investor up to $40 million of shares of common stock for a 36-month period, for which the Cantor Investor received 190,476 commitment shares of common stock on September 16, 2022.

55.     Ultimately, none of the representations about FOXO's viability proved true, whether as to litigation and regulatory investigations, dilution of shares, growth projections, or profits.  Upon consummation of the merger, 99.5% of the SPAC investors redeemed their shares draining Delwinds of most of its cash and FOXO's stock traded down from $10.14 per share to less than $2.00/share in only eight days.

56.     As of November 17, 2022, FOXO's stock price closed at $0.444 per share a 95.6 % decline.

57.     Upon closing of the Merger, according to FOXO's calculations, the outstanding amount due under the Debenture was $2,336,937.  Pursuant to the ill-gotten Amendment, the Debenture was required to be converted into 647,774 shares of FOXO according to the Letter of Transmittal of FOXO's Transfer Agent sent to Smithline (which required Smithline to sign a release of FOXO to get its shares).  Based on the value of the common shares at closing (approximately $10.14/share), the value of the shares to be delivered at closing to Smithline was to be approximately $6,568,428. Smithline's Warrants to purchase 181,685 shares of FOXO at

- 17 -

$6.21/share (each, as adjusted for the merger) were thus in the money at closing by a total of $714,022. This $7,282,450 of value to be delivered at closing to Smithline quickly evaporated.

58.    Instead of receiving these substantial profits, Smithline and the original Debenture investors were left to face the extreme, devastating consequences of these financial losses while the subsequent investors, who were not subject to the lack of disclosure and lock up agreement, were able to exit their positions.  Sabes was able to receive his outsized payments in the transaction (including a share grant pursuant to the management share plan valued at in excess of $35,560,980 at the time of grant), Bespoke its $8,500,000 giveaway of cash and shares, and Andrew Poole and his colleagues were able to save their $6,325,000 investment in Delwinds without investing more money in the merger transaction.

59.    Effective as of November 14, 2022, a mere two months after the consummation of the merger, as the Company continued to unravel.  Jon Sabes was terminated as CEO and Chairman of the Board (while remaining as a Director) and his brother Steven Sabes was terminated as COO. The Company's Chief Technology Officer was appointed as interim CEO while the Company commenced a search process to identify its new CEO.

60.    Due to the disarray caused by FOXO and Sabes's activities, the Company was unable to timely file its 10-Q for the quarter ending September 30, 2022.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract-Against FOXO)

61.    Smithline repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

62.    Smithline and FOXO were parties to the Financing Documents.

63.    The Financing Documents were enforceable written contracts as between Smithline and FOXO.

64.     Smithline fully-performed under the Financing Documents and provided $1,000,000 to FOXO.

65.     FOXO breached the Financing Documents when it:

a.  Failed to disclose that FOXO's then Chairman of the Board and CEO, Sabes, was involved in litigation and an SEC investigation, pursuant to Section 3.1(j) of the SPA and as of the date Smithline agreed to the Amendment.

b.  Failed to disclose the self-serving management share plan as of the date Smithline agreed to the Amendment.

c.  Failed to disclose that the second round of debenture shares were not locked up when Smithline agreed to the Amendment.

d.  Failed to disclose the SPAC was not required to deliver in excess of $10 million of cash as of the date Smithline agreed to the Amendment.

e.  Made an improper dilutive issuance pursuant to Section 5(b) of the Debenture and Section 3(b) of the Warrant.

f.  Failed to amend the conversion price of the Debentures and the exercise price and number of shares to be received upon exercise of the Warrants based upon the dilutive issuance and to issue the additional shares to which Smithline was thereby entitled pursuant to Section 5(b) of the Debenture and Section 3(b) of the Warrant.

g.  Failed to repay or redeem the Debenture pursuant to Section 8(b) of the Debenture.

h.  Failed to purchase the Warrant at the Black Scholes Value pursuant to Section 3(e) of the Warrant.

66.     Smithline's $1,000,000 investment has been substantially injured by FOXO's multiple breaches of the Financing Documents. But for the ill-gotten Amendment, (i) there would have been an Event of Default under the Debentures ($2,336,937 outstanding as of the closing date of the merger) that would have made them due and payable at the Mandatory Default Amount (*i.e.*, the sum of (a) 130% of the outstanding principal amount of this Debenture, plus (b) 130% of accrued and unpaid interest hereon and (c) 130% of all other amounts, costs, expenses and liquidated damages due in respect of the Debenture) or $3,038, 018, plus accrued default interest and late fees each at 18% accruing from the date of the merger to the date of repayment in accordance with its terms and (ii) the Warrants would have been required to be purchased by FOXO at the Black Sholes Value thereof (a value to Smithline of $2,406,731, without giving effect to the dilutive issuance, or $3,168,750, with giving effect to the dilutive issuance's impact on the exercise price of the warrants, but not the increase in the number of shares in the anti-dilution provisions of the Warrant).

67.     The value of Smithline's FOXO's stock and warrants, which were anticipated to deliver substantial profits to Smithline (the stock's value at the closing of the merger was approximately $6,568,428 and the warrants were $714,022 in the money at such date for a total aggregate value of $7,282,450), even more so if the dilutive issuance had been properly recognized, and which would have been not subject to the lock-up and freely salable at closing but for the ill-gotten consent, has been eviscerated with the 95.6 % decline in value of the stock since the merger.

68.     As a result, Smithline has been damaged in an amount to be determined at trial, but estimated to be in excess of a minimum of $6,206,768 (i.e., the amount that the Debenture and Warrant –without giving effect to the dilutive issuance's impact to the number of shares to

be purchased thereunder – should have been required to be purchased at the consummation of the merger), plus accrued interest and late fees under the Debenture, each at 18% until the date of repayment.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Unjust Enrichment – Against FOXO and Sabes)**

69.     Smithline repeats and re-alleges each and every allegation set forth above as if more fully set forth herein.

70.     Smithline fully-performed all acts that FOXO requested it perform in connection with the Financing Documents and the SPAC merger, and invested $1,000,000 in FOXO.

71.     FOXO and Sabes made numerous misrepresentations and material omissions to Smithline and provided inaccurate, misleading information all while FOXO, and Sabes and his cohorts, benefitted from Smithline's performances in connection with the Financing Documents and the SPAC merger.  FOXO has retained the value of that benefit—Smithline's financing of FOXO's transaction—without compensating Smithline for its fair value or the consequences of its misrepresentations and omissions, without which Smithline would not have entered into the financing transaction and subsequent Amendment with FOXO and FOXO would not have been able to enter the SPAC merger without repaying or redeeming the Debentures and repurchasing its Warrants.

72.     In light of the benefit FOXO, and Sabes, received, it would be against equity and good conscience to permit FOXO, and Sabes, to retain the benefits conferred by Smithline, particularly in light of the misleading and materially omitted statements FOXO used to obtain and induce receipt of those benefits.

73.     Smithline has been damaged by FOXO's unjust retention of the financial benefits of Smithline's investment.

74.     Accordingly, FOXO and Sabes have been unjustly enriched, and Smithline has been damaged, in an amount to be determined at trial, but estimated to be in excess of a minimum of $6,206,768 (i.e., the amount that the Debenture and Warrant – without giving effect to the dilutive issuance's impact to the number of shares to be purchased thereunder – should have been required to be purchased at the consummation of the merger), plus accrued interest and late fees under the Debenture, each at 18% until the date of repayment.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Fraud – Against FOXO and Sabes)

75.     Smithline repeats and re-alleges each and every allegation set forth above as if more fully set forth herein.

76.     FOXO and its representatives, including Sabes, falsely represented to Smithline that its officers were not involved in  litigation or SEC investigation, materially omitted to advise Smithline that the SPAC transaction contained numerous self-dealing provisions including the management share plan, materially omitted to advise Smithline that the second round debenture investors were not locked up when soliciting Smithline's consent and agreement to the Amendment, materially omitted to advise Smithline that the SPAC (through its sponsor group) was not delivering more than $10 million to the merged company and materially omitted to recognize the dilutive issuance to Bespoke which would have entitled Smithline to significantly more shares.

77.     Smithline justifiably relied on these misrepresentations and omissions of fact in deciding to enter into the Financing Documents and to invest $1,000,000 in FOXO and to enter into the Amendment.

78.     In fact, FOXO and Sabes always intended to make these misrepresentations and material omissions in order to induce Smithline's investment in FOXO, and its execution of the Financing Documents, and Amendment permitting the SPAC transaction.

79.     FOXO and Sabes had full knowledge of their misrepresentations and material omissions of fact, and intended to induce Smithline's investment and Amendment and cooperation thereby.

80.     Accordingly, as a result of FOXO and Sabes's fraudulent conduct, Smithline has been damaged, in an amount to be determined at trial, but estimated to be in excess of a minimum of $6,206,768 (i.e., the amount that the Debenture and Warrant – without giving effect to the dilutive issuance's impact to the number of shares to be purchased thereunder – should have been required to be purchased at the consummation of the merger), plus accrued interest and late fees under the Debenture, each at 18% until the date of repayment.

**WHEREFORE**, Smithline demands judgment as follows:

(a)     On the First Cause of Action, in favor of Smithline and against FOXO, damages in an amount to be determined at trial, estimated to be in excess of a minimum of $6,206,768, plus accrued interest and late fees under the Debentures, each at 18% until the date of repayment;

(b)     On the Second Cause of Action, in favor of Smithline and against FOXO and Sabes, damages in an amount to be determined at trial, estimated to be in excess of a minimum of $6,206,768, plus accrued interest and late fees under the Debentures, each at 18% until the date of repayment;

(c)     On the Third Cause of Action, in favor of Smithline and against FOXO and Sabes, damages in an amount to be determined at trial, estimated to be in excess of a

- 23 -

Case 1:22-cv-10858-VEC   Document 1-1   Filed 12/23/22   Page 27 of 32

minimum of $6,206,768, plus accrued interest and late fees under the Debentures, each at

18% until the date of repayment;

      (d)     For costs and disbursements in this action, including attorneys' fees;

      (e)     For such other and further relief as the Court deems just, equitable and

proper under the facts and circumstances of this case.


Dated: New York, New York
       November 18, 2022


              SICHENZIA ROSS FERENCE LLP


         By:_____*/s/ Sameer Rastogi*_____
               Sameer Rastogi, Esq.
               Owen A. Kloter, Esq.
            1185 Avenue of the Americas, 31st Floor
            New York, NY 10036
            (212) 930-9700
            okloter@srf.law

            *Attorneys for Plaintiff Smithline Family Trust II*

- 24 -

Case 1.22-cv-10858-VEC   Document 1-1   Filed 12/23/22   Page 28 of 32

## VERIFICATION

STATE OF NEW YORK )
)  ss.: *Rye*
COUNTY OF ~~NEW YORK~~ *Westchester* )

Richard Smithline, being duly sworn, deposes and says that he has read the foregoing

Verified Complaint, and knows the contents thereof, and that the same is true to his knowledge;

except as to the matters therein stated to be alleged upon information and belief, and as to those

matters, he believes them to be true.

_____
Richard Smithline,
Authorized signatory, Smithline Family Trust II

Subscribed and sworn to before me
this 18th day of November 2022

_____
NOTARY PUBLIC

DREW ALEXANDER
Notary Public of New York
I.D. 01AL641646
COMMISSION EXPIRES 03/01/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

SMITHLINE FAMILY TRUST II, as                          :
      Assignee of Puritan Partners LLC,

                                :    Index No.: 654430/2022

              Plaintiff,

                                :

     - against -

                                :    **NOTICE OF APPEARANCE**

FOXO TECHNOLOGIES, INC., a Delaware
Corporation, and JON SABES,                            :

             Defendants.      :

-------------------------------------------------------------X

      **PLEASE TAKE NOTICE** that as of November 21, 2022, Owen A. Kloter, Esq. hereby

appears in the above-captioned matter on behalf of Plaintiff Smithline Family Trust II, and

demands that all papers in this action be served upon the undersigned at the address stated below.

Dated: New York, New York
       November 21, 2022

                    Respectfully submitted,

                    SICHENZIA ROSS FERENCE LLP

                  By:_____/s/ Owen A. Kloter_____
                      Owen A. Kloter
                    1185 Avenue of the Americas, 31st Floor
                    New York, NY 10036
                    (212) 930-9700
                    okloter@srfkllp.com

                    *Attorneys for Plaintiff Smithline Family Trust II, as*
                    *Assignee of Puritan Partners, LLC*



UCS-840
(rev. 02/01/2022)

# REQUEST FOR JUDICIAL INTERVENTION

## Supreme COURT, COUNTY OF New York

Index No: _____654430/2022_____    Date Index Issued: ____11/21/2022____

| **For Court Use Only:** |
| --- |
| IAS Entry Date |
| |
| Judge Assigned |
| |
| RJI Filed Date |
| |

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

Smithline Family Trust II, as Assignee of Puritan Partners LLC

Plaintiff(s)/Petitioner(s)

-against-

FOXO Technologies, Inc., Jon Sabes

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING:**    Check only one box and specify where indicated.

| **COMMERCIAL** | **MATRIMONIAL** |
| --- | --- |
| ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.) | ☐ Contested |
| ☒ Contract | *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum (UCS-840M).* |
| ☐ Insurance (where insurance company is a party, except arbitration) | |
| ☐ UCC (includes sales and negotiable instruments) | *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).* |
| ☐ Other Commercial (specify): _____ | |

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**REAL PROPERTY** Specify how many properties the application includes: _____

☐ Condemnation
☐ Mortgage Foreclosure (specify): ☐ Residential    ☐ Commercial
Property Address: _____

*NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*

☐ Partition
*NOTE: Complete and attach the PARTITION RJI ADDENDUM (UCS-840P).*
☐ Tax Certiorari (specify): Section: _____ Block: _____ Lot: _____
☐ Tax Foreclosure
☐ Other Real Property (specify): _____

**TORTS**

☐ Asbestos
☐ Child Victims Act
☐ Environmental (specify): _____
☐ Medical, Dental or Podiatric Malpractice
☐ Motor Vehicle
☐ Products Liability (specify): _____
☐ Other Negligence (specify): _____
☐ Other Professional Malpractice (specify): _____
☐ Other Tort (specify): _____

**OTHER MATTERS**

☐ Certificate of Incorporation/Dissolution    [see NOTE in COMMERCIAL section]
☐ Emergency Medical Treatment
☐ Habeas Corpus
☐ Local Court Appeal
☐ Mechanic's Lien
☐ Name Change/Sex Designation Change
☐ Pistol Permit Revocation Hearing
☐ Sale or Finance of Religious/Not-for-Profit Property
☐ Other (specify): _____

**SPECIAL PROCEEDINGS**

☐ Child-Parent Security Act (specify): ☐ Assisted Reproduction ☐ Surrogacy Agreement
☐ CPLR Article 75 - Arbitration    [see NOTE in COMMERCIAL section]
☐ CPLR Article 78 - Proceeding against a Body or Officer
☐ Election Law
☐ Extreme Risk Protection Order
☐ MHL Article 9.60 - Kendra's Law
☐ MHL Article 10 - Sex Offender Confinement (specify): ☐ Initial ☐ Review
☐ MHL Article 81 (Guardianship)
☐ Other Mental Hygiene (specify): _____
☐ Other Special Proceeding (specify): _____

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
| --- | --- | --- | --- |
| Has a summons and complaint or summons with notice been filed? | ☒ | ☐ | If yes, date filed: ____11/18/2022____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

☐ Infant's Compromise
☐ Extreme Risk Protection Order Application
☐ Note of Issue/Certificate of Readiness
☐ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
☐ Notice of Motion    Relief Requested: _____    Return Date: _____
☐ Notice of Petition    Relief Requested: _____    Return Date: _____
☐ Order to Show Cause    Relief Requested: _____    Return Date: _____
☐ Other Ex Parte Application    Relief Requested: _____
☐ Partition Settlement Conference
☐ Poor Person Application
☐ Request for Preliminary Conference
☐ Residential Mortgage Foreclosure Settlement Conference
☐ Writ of Habeas Corpus
☒ Other (specify): Transfer to Commercial Division

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|
| **Case Title** | **Index/Case Number** | **Court** | **Judge (if assigned)** | **Relationship to instant case** |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| PARTIES | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | |
|---|---|---|---|---|
| **Un-Rep** | **Parties**<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | **Attorneys and Unrepresented Litigants**<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | **Issue Joined**<br>For each defendant, indicate if issue has been joined. | **Insurance Carriers**<br>For each defendant, indicate insurance carrier, if applicable. |
| ☐ | Name: Smithline Family Trust II, as Assignee of Puritan Partners LLC<br>Role(s): Plaintiff/Petitioner | OWEN KLOTER, Sichenzia Ross Ference LLP, 1185 Avenue of the Americas 31st Floor, New York, NY 10036, (212) 930-9700, okloter@srf.law | ☒ YES ☐ NO | |
| ☒ | Name: FOXO Technologies, Inc.<br>Role(s): Defendant/Respondent | c/o Corp. Serv. Co. 251 Little Falls Drive, Wilmington , DE 19808 | ☐ YES ☒ NO | |
| ☒ | Name: Sabes, Jon<br>Role(s): Defendant/Respondent | 663 Bushaway Road, Wayzata, MN 55391-1913 | ☐ YES ☒ NO | |
| ☐ | Name:<br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br>Role(s): | | ☐ YES ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: 11/21/2022

OWEN ANDREW KLOTER
Signature

4838223
Attorney Registration Number

OWEN ANDREW KLOTER
Print Name

*This form was generated by NYSCEF*

UCS-840C
3/2011

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF  New York**

_____x

Smithline Family Trust II, as Assignee of Puritan Partners LLC

                                    **Plaintiff(s)/Petitioner(s)**

-against-

FOXO Technologies, Inc., Jon Sabes

                                    **Defendant(s)/Respondent(s)**
_____x

**Index No:  654430/2022**

**RJI No. (if any):**

## COMMERCIAL DIVISION

**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

6206768.00

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) and (c).**

**Dated:**   11/21/2022

OWEN ANDREW KLOTER

**SIGNATURE**

OWEN ANDREW KLOTER

**PRINT OR TYPE NAME**

_This form was generated by NYSEF_