# Exhibit 1 – Redlined Amendments

SUPREMEUNITED STATES DISTRICT COURT OF THE STATE
SOUTHERN DISTRICT OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X
SMITHLINE FAMILY TRUST II, as                 :
      Assignee of Puritan Partners LLC._____:
                                              Index No.:
                                      :           Case No. 1:22-cv-10858-VEC
                           Plaintiff,_____:
                                        :
                                        :
          - against -                 :
:       VERIFIED             :        **AMENDED**
**COMPLAINT**
FOXO TECHNOLOGIES, INC., a Delaware_____:
Corporation, and JON SABES,                   :
                                        :
                          _____Defendants.       :
-------------------------------------------------------------X

Plaintiff Smithline Family Trust II, as Assignee of Puritan Partners LLC ("Smithline" or

"Plaintiff"), by and through its attorneys Sichenzia Ross Ference LLP, as and for its

VerifiedAmended Complaint against FOXO Technologies, Inc.  ("FOXO") and Jon Sabes, the

recently terminated CEO and former Chairman of the Boardand CEO of FOXO ("Sabes,"

collectively with FOXO, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action concerns the intentional, willful, and malicious manipulation and

misrepresentation and omission of critical material information, deliberately concealed

wrongdoing that should have been disclosed to investors, and inside deals and favors that

represented conflicts of interest to conflicted parties.  Desperate, for various self-serving reasons,

for a transaction to be consummated at all costs, Defendants and their cohorts deliberately

disregarded the terms of investors' investment interests in contravention of their investment

documents.  The end ~~result~~results of these acts and omissions caused significant harm to the investors.

2.     All of these acts and omissions occurred in the context of a debenture and warrant investment, and subsequent merger of FOXO with a special purpose acquisition company ("SPAC") called Delwinds Insurance Acquisition Corp. ("Delwinds"), which were orchestrated by FOXO's ~~then~~ Chairman of the Board and CEO Jon Sabes~~, an individual whose~~.  Sabes' prior company, from which FOXO was spun out, was already under investigation for financial misdeeds committed during his tenure as Chairman ~~of the Board~~ and CEO ~~of that company~~, also inuring to his benefit—at investors' expense— which investigation was ~~undisclosed~~not disclosed to ~~FOXO~~ investors~~, including Smithline~~ in this case.

3.     When the proverbial music stopped at the end of ~~Sabes's~~Sabes' performance, FOXO's investors had lost millions of dollars, its stock price has and continues to crater, its ~~debenture holders~~lenders were never repaid nor were their warrants repurchased as required by the transaction documents, ~~its investment bankers and financing providers terminated their relationships with the Company,~~ and Sabes and his cohorts ~~received~~walked away with a millions of dollars in a purported management share plan, bloated "consulting fee" payments, and stock, ~~and consideration for financings they did not perform,~~ all at the expense of FOXO's investors.

**PARTIES**

4.     Plaintiff Smithline is, and at all times relevant herein was, a Grantor Trust organized and existing under the laws of the State of New York.  Richard Smithline is Smithline's authorized representative.

5.     Upon information and belief, ~~defendant~~ FOXO ~~Technologies, Inc.~~ is a corporation organized under the laws of the State of Delaware.

6.    ~~Defendant Sabes is an individual, who~~<u>Upon information and belief,</u> at <u>all</u> times relevant ~~herein~~ <u>hereto, Sabes</u> was ~~CEO and Chairman~~<u>a resident</u> of the ~~Board~~<u>State</u> of ~~FOXO, until being terminated by~~<u>Texas and/or</u> the ~~Company as CEO and Chairman~~<u>State</u> of ~~the Board effective as of November 14, 2022, after which time he remains a Director of FOXO~~<u>Minnesota</u>.

- 3 -

**JURISDICTION AND VENUE**

7.      Pursuant to a Securities Purchase Agreement ("SPA"),.") dated January 25, 2021, and an accompanying 12.5% Original Issue Discount Convertible Debenture, due February 23, 2022, and Warrant to purchase, initially, up to 312,500 shares of FOXO common stock until February 23, 2024 (collectively, including the other documents entered into in connection therewith, the "Financing Documents"), both Smithline and FOXO submitted themselves to the laws of the State of New York with exclusive general jurisdiction in the courts of the State of New York, Borough of Manhattan. Sabes executed the Financing Documents (and subsequent Amendment) as CEO of FOXO.

8.      Specifically, Section 5.9 of the SPA reads as follows:

Governing Law. All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal Proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (*whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents*) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any Action or Proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such Action or Proceeding is improper or is an inconvenient venue for such Proceeding.

(Emphasis added.)

9.      Defendant FOXO removed this action from the Supreme Court of the State of New York, County of New York, to the United States District Court of the Southern District of New York pursuant to 28 U.S.C. §§ 1441 and 1446.  This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because it is a civil action between parties of diverse citizenship (Plaintiff is a citizen of New York; Defendant FOXO is a Delaware corporation with a principal place of business in Minnesota; and Defendant Sabes is a citizen of Texas and/or Minnesota), and Plaintiff alleges the amount in controversy exceeds $75,000.

10.     Pursuant to New York's long-arm statute, the courts of the State may exercise jurisdiction over any non-domiciliary who in person or through an agent transacts any business within the state.

11.     Although a non-domiciliary, Sabes, as admitted in an affidavit, visited New York several times in his capacity as FOXO's CEO to transact business on FOXO's behalf.

12.     Upon information and belief, Sabes as CEO of FOXO was in New York, New York at the Insurtech Insights Conference with several members of the FOXO team, speaking at the Jacob K. Javits Convention Center on May 25 and 26, 2022 about what the Insurance marketplace will look like in 2030.

13.     In addition, Sabes projected himself into New York by way of at least thirteen (13) Zoom videoconferences and telephone conferences with Smithline, Smithline's son and FOXO representatives, and was joined on those calls by various of his agents, all located in New York.  Smithline met in person on two occasions in New York with one of Sabes' investment bankers, and had telephone calls with several others of his agents, including several of his investment bankers, all located in New York.

14.    Thus, Sabes transacted business within New York, purposefully projected himself into New York for purpose of availing himself of the benefits of this forum, and was actively complicit in the breach of the representations and warranties and covenants contained in the Financing Documents and subsequent amendment.

## FACTUAL BACKGROUND

**Puritan Partners LLC and FOXO Enter ~~into the~~Into The Financing Documents**

~~8.~~15.    Joseph Gunnar & Co. LLC, a broker-dealer in New York, New York ("JGUN"), acting as FOXO's investment banker, initially approached Smithline and other investors in January 2021, about investing in FOXO.  JGUN arranged all of the financing under the Financing Documents, as well as other financings from time to time for FOXO during the period in question.  On or about January 25, 2021, Puritan Partners LLC ("Puritan") entered into the SPA with FOXO.  Under the terms of the SPA, Puritan purchased debentures and warrants from FOXO for $1,000,000.

16.    During the time the Parties were negotiating the SPA, Sabes had multiple telephone calls with Smithline, and three representatives from JGUN, to discuss the SPA and the financing. The calls took place on December 28, 2020, February 10, 2021, and February 17, 2021.

17.    In those discussions, Sabes discussed the financing history of FOXO to date. He noted that he and his brother Steven had invested $1,750,000 million in FOXO and his lead investor Bespoke Growth Partners, Inc. had invested $1,500,000 million in FOXO, each in the same Debenture round that was being offered to Smithline.  Sabes failed to mention that neither Bespoke nor its principal Mark Peiken had any role in the transaction other than as an investor. Sabes then mentioned that his entities owned 71% of FOXO and that GWG Holdings, Inc., a company that he had founded, and for which he had been Chairman and CEO, and from which FOXO had been spun out of, owned 8 million shares of Series A preferred stock of FOXO having invested $20,000,000 million in 2019.  He discussed his success at, and his successful exit from, GWG Holdings.  He continued by noting that the amount that GWG Holdings had

invested in FOXO, which was going to be one of the reference points for the conversion price for the Debentures, was $30,000,000.  Sabes never mentioned the ongoing SEC investigation and litigation involving GWG Holdings, notwithstanding that the investigation and litigation took place during his tenure as Chairman and CEO.  He mentioned that FOXO had acquired a life insurance company in the fourth quarter of 2020 and that FOXO would start generating revenues in the second quarter of 2021 with the launch of FOXO life insurance.  He added that such revenues would be at a substantial $50 million run rate by the end of 2022 before significantly increasing further thereafter (as set forth in FOXO's model provided to Smithline). He noted that FOXO had a broad patent for epigenetics for life insurance and was going to launch FOXO life and commercial biomarkers, which would subsequently take over the distribution of life insurance.

18.     In a telephone call on February 17, 2021, with three representatives of JGUN and Mark Peiken, who was presented as being the lead investor in the FOXO Debentures round without  mentioning his other relationships with FOXO, Peiken lauded Sabes,  referring to him as the "Elon Musk of the insurance industry". Smithline relied on Peiken's favorable evaluation because he was a lead investor in the FOXO Debenture offering, and because his other roles with FOXO (for which he was to be compensated) were not disclosed.

9.19.   Pursuant to the SPA, and in consideration for its investment, Puritan received a 12.5% Original Issue Discount Secured Convertible Debenture due February 23, 2022 (the "Debenture") in the principal amount of $1,125,000, and a warrant to purchase initially up to 312,500 shares of FOXO's common stock until February 23, 2024 (the "Warrant").

10.20.  The Warrant provided for an exercise price of the lesser of (i) the original issue price under FOXO's Certificate of Incorporation, or (ii) in the event that a qualified offering was

consummated prior to the exercise, the qualified offering price, subject to all adjustments thereunder.

21.  Upon information and belief, the original issue price, as later disclosed in public filings, was $3.61 per share.

22.  Section 3.1(j) of the SPA provided that FOXO, its subsidiaries, officers, and directors, were not and had not been the subject of any securities law or breach of fiduciary duty claims, were not being investigated by the United States Securities and Exchange Commission ("SEC"), and that there had not been, and was not currently, an investigation involving the Company or any such party.

23.  Section 5(b) of the Debenture (as well as Section 3(b) of the Warrant) provided that if, at any time while the Debenture was outstanding, FOXO or any subsidiary sold or granted any option to purchase any of FOXO's common stock at a price per share that was lower than the then conversion price (or, in the case of the Warrant, the exercise price), the Company must notify the existing holders (including Smithline), reduce the conversion price of the existing Debenture (or, in the case of the Warrant, the exercise price) to the dilutive price and the Debenture holders and Warrant holders and would be entitled to receive additional shares at the dilutive price upon conversion of their Debenture or exercise of their Warrant.

24.  In addition, the SPA provided for the delivery of a Lock-Up Agreement, to prevent the original Debenture investors, such as Smithline, from selling their FOXO shares received upon conversion of their Debentures or exercise of their Warrants commencing on the closing date of any qualified offering, and continuing for one hundred eighty (180) days thereafter.

15.25.  Pursuant to a model, provided to investors, of FOXO's projected financial results given to investors, including Smithline, in conjunction with their investment in FOXO, FOXO's five-year projections provided for a growth in its revenues from $873,069 in 2021 to an impressive $4,766,825,407 for the year ending December 31, 2025.  The figures provided in the model were significantly more aggressivedrastically different than other financial information that was later subsequently provided to Smithline and other investors, including financial information providedwhich was later disclosed to the investors in the subsequent SPAC transaction. Smithline relied on the numbers in that model as well as Sabes' representations as to the company's projected returns to make its investment in the Debenture and Warrant.

16.26.  On or about October 1, 2021, Puritan assigned the Debenture and Warrant to Smithline Family Trust II.

17.27.  As will become apparent from the additional facts that follow, FOXO breachedand Sabes conspired to breach the Financing Documents in multiple ways, made numerous misrepresentations and omissions of material fact, and undermined itsthe investors for the benefit of itsFOXO's executives, insiders, purported "consultants" as well as the sponsor of the SPAC, including Andrew Poole, Chairman and CEO of Delwinds, with which FOXO ultimately merged.  Poole's dealings with Sabes enabled Sabes to massively dilute FOXO's shareholders (by directing shares that were initially to go to FOXO investors to Sabes and his management team) while saving the sponsor group's $6,325,000 investment in Delwinds, which it would have lost had it not been able to merge Delwinds with FOXO.

28.     Notably, after executing the Financing Documents, Sabes engaged in thirteen (13) Zoom videoconferences with Smithline, Smithline's son, FOXO employees, and various

investment banks, including MTS Partners, Credit Suisse, Oppenheimer & Co, B. Riley Financial, Raymond James, and others.

29.     The foregoing Zoom videoconferences took place on April 13, 2021 (2 Zoom calls), April 14, 2021 (2 Zoom calls), April 15, 2021, April 16, 2021, April 17, 2021, April 23, 2021, April 28, 2021 (2 Zoom calls), July 13, 2021, October 18, 2021, and January 14, 2022.

30.     The foregoing Zoom calls directly related to the Debentures, the Financing Documents, and Sabes and FOXO's utilization of the investment banks to engage in further financing for FOXO.

31.     Sabes also acted through various agents in New York, including but not limited to:

    a.   JGUN, an investment bank, whose principal place of business is 30 Broad Street, 11th Floor, New York, New York 10004.

    b.   Deutsche Bank AG, an investment bank, whose principal place of business in the United States of America is 1 Columbus Circle, New York, New York 10019.

    c.   Cantor Fitzgerald, L.P., an investment bank, whose principal place of business is 110 East 59th Street, New York, New York 10022.

    d.   Mitchell Silberberg & Knupp LLP, attorneys during the transactions that are the subject of this Complaint, whose office is located at 437 Madison Avenue, 25th Floor, New York, New York 10022.

32.     Each of these agents acted on behalf of and at the direction of Sabes and FOXO with respect to the Financing Documents and, thus, the transactions with Smithline and/or additional financings of FOXO within the State of New York. In addition, Smithline met in

person on two occasions in New York with one of FOXO and Sabes' investment bankers who also served as a special counsel to FOXO and Sabes' law firm, *i.e.*, Mark Peiken of Bespoke Growth Partners, Inc., and had telephone calls with several others of FOXO's and Sabes' agents, including several of FOXO's and Sabes' investment bankers and law firm, all located in New York.

33.    Through all of the foregoing actions, Sabes projected himself into the State of New York through the foregoing agents in order to conduct business, on behalf of FOXO, with Smithline in New York.

**The Memorandum and Amendment**

18.34.   ApproximatelyAbout a year after closing on the sale of the Debentures, on January 17, 2022, Sabes sent Richard Smithline, Smithline's authorized representative, a memorandum entitled "FOXO Updates and Amendment" from Jon Sabes Chief Executive Officer, FOXO to FOXO Bridge Financing Investor (the "Memo").

19.35.   In the MemoIn the Memo, which Sabes' advisors later claimed they had not seen prior to its being sent out and which was prepared by Sabes, Sabes explained that he was seeking to amend the SPA to aid in FOXO's efforts to complete a business combination with a SPAC. Sabes claimed that the SPAC would increase FOXO's value, providing the original investors, such as Smithline, with: (1) an approximate 2.5 times return on their debenture investment, (2) warrants which will be approximately $6.00 per share in the money, and (3) $18.00 per share in total consideration providing investors with an approximate 5 times return in approximately 18 months.  He further stated in the Memo "[w]hat is exciting about our proposed transaction is that the SPAC sponsor *is* strategic, bringing value beyond just capital, and while FOXO will be

valued at a significant increase from the Bridge Financing, our valuation is reasonable given the exciting future growth opportunity we have."

20.36.  Although the Memo presented the opportunity for FOXO to merge into a SPAC as a benefitthat allegedly would be beneficial for Smithline and other investors, Sabes had a pernicious ulterior motive by which; he intended to extract the majority of the economics of the transaction for his own and his cohorts' benefit, while leaving FOXO's investors, such as Smithline, holding the proverbial bag.

37.     Specifically highlighting Sabes' malfeasance, the Memo failed to disclose that underlying the SPAC transaction includedwas a $100,000,000 management share plan (with an unheard of 50% of the consideration given to FOXO shareholders in the transaction) which would benefit Sabes and his cohorts at the expense of FOXO's investors.  When Smithline later asked JGUN if it knew that there was a $100,000,000 management share plan, JGUN advised that the shares subject to the plan were originally designated for FOXO shareholders, but that Sabes had instead directed them to himself and management.

38.     The Memo also failed to mention that the shares underlying a second debenture offering issued by FOXO to fund the transaction would not be subject to a lock up agreement, as the initial Debenture shares were to be, to the direct and distinct disadvantage of the original Debenture investors, including Smithline.

39.     Moreover, the Memo failed to disclose that the SPAC (through its sponsor group) would not be required to deliver in excess of $10 million of capital to the transaction despite the SPAC's having $201 million in trust at that time.

21.40.  Further, the Memo omitted any reference to the ongoing SEC investigation and litigation regarding Sabes' prior company during his tenure as Chairman and CEO of GWG

- 13 -

Holdings, events that would be publicly disclosed later in a June 24, 2022 article in the *Wall Street Journal* and the proxy statement and /prospectus for the SPAC merger.

22.41.  Shortly thereafter, FOXO's investment banker, JGUN sent Smithline an Amendment Agreement (the "Amendment") seeking the consent of 50.01% of the original Debenture investors for a variety of amendments to the Financing Documents.

23.42.  The proposed Amendment included, with respect to the Debentures:

    a.  Consummating the merger with the SPAC by modifying the term of a qualified offering.

    b.  Allowing FOXO to incur additional indebtedness (*i.e.*, the second debenture offering).

    c.  Amending the definitions of "prepayment amount", "final extension amount", "SPAC transaction amount" and "SPAC transaction date".

    d.  Extending the maturity date of the original Debentures.

    e.  Modifying what constituted an Event of Default under the Debentures.

24.43.  The Amendment also sought the following with respect to the Warrants:

    a.  Modifying the exercise price.

    b.  Modifying the definition of a Fundamental Transaction so as not to require the purchase of the Warrants in conjunction with the merger of FOXO with and into the SPAC.

25.44.  If the amendments were not approved by 50.01% of the Debenture investors, (i) the Debenture holders would not have been required to convert their Debentures into shares of the surviving corporation of the merger, (ii) the incurrence of the indebtedness to finance the transaction would have constituted an Event of Default under the Debentures causing the

Debentures to be immediately due and payable at the Mandatory Default Amount (*i.e.*, the sum of (a) 130% of the outstanding principal amount of this Debenture, plus (b) 130% of accrued and unpaid interest hereon and (c) 130% of all other amounts, costs, expenses and liquidated damages due in respect of the Debenture), (iii) the interest rate on the Debenture would have increased to 18% , (iv) 18% late fees would begin to accrue  under the Debentures,  (v) FOXO would have been required to buy back the Warrants from the Debenture and Warrant investors at the Black Scholes Value (as defined in the Warrant) thereof, a value to Smithline in excess of several million dollars (*i.e.*, $2,406,731, without giving effect to the dilutive issuance. or $3,168,750, with by giving effect to the dilutive issuance's impact on the exercise price of the warrants. but not giving effect to the increase in the number of warrant shares in the anti-dilution provisions of the Warrant) and (vi) the shares underlying the Debentures and the Warrants would not have been subject to a lock-up after the merger with the SPAC as such transaction would not have constituted as a Qualified Offering .

26.45.  JGUN, which was in the obviously-conflicted position of both negotiating the terms of the amendment with FOXO on behalf of its investors, and soliciting the consent to the amendment on behalf of FOXO, was not initially successful in getting the required 50.01% consent to approve the Amendment.

46.     As a resultAs a result of JGUN's initial failure to get the required consent and as documented in correspondence from JGUN's President, Sabes wrested control of the transaction from JGUN and covertly and directly solicited the Debenture investors, including Smithline, on different terms.

47.     On February 14, 2022, Sabes, Smithline, and Smithline's son engaged in another Zoom videoconference regarding the Amendment.  As before, Sabes engaged in the

- 15 -

videoconference for the purpose of conducting business with Smithline in New York to solicit his consent to amend the Financing Documents.

48.     Sabes implied to Smithline such~~such~~that the Amendment had been approved by JGUN on behalf of its clients~~but~~, but made certain misleading statements and did not disclose certain material facts to Smithline or other investors.~~Based~~, as detailed below.

~~27.~~49.  Smithline and other investors relied on Sabes' misleading statements.  Indeed, under the guise of these misrepresentations and material omissions by Sabes, Smithline and more than 50.01% of the other Debenture investors approved the Amendment.  Smithline signed the Amendment as between itself and FOXO without knowing that material misleading statements were made by Sabes and material facts were not disclosed by Sabes in conjunction with ~~Sabes soliciting~~Sabes' solicitation of the Amendment.

~~28.~~50.  JGUN's President criticized ~~Sabes's~~Sabes' rogue efforts by stating, in writing, that the consent solicitation was done "covertly and directly" by Sabes ~~as~~because JGUN would not endorse the Amendment without the release of the lock-up agreement on the initial Debenture investors.  According to ~~JGUN~~JGUN's President, Sabes had reneged on his agreement to remove the lock-up for the initial Debenture investors so he sent his own amendment version to investors without JGUN's endorsement.  ~~JGUN~~JGUN's President further stated of Sabes: "his attempt to now self-direct a second bridge [financing] offering ex-JGUN is a reflection of the unfortunate friction caused by me calling him out on his bad faith dealing." Denying that ~~it~~JGUN knew about the management share plan, ~~JGUN~~JGUN's President concluded "his behavior pattern is bs [*sic*]."

~~29.~~51.  Under direct questioning by Smithline as to the terms of the SPAC transaction, Sabes focused on the 5 times return investors were supposed to receive on their investment.

Formatted: Indent: Left:  0.06", First line:  0.44"

Sabes refused to disclose the terms of the merger, including a $100,000,000 share plan, which amounted to a share grant to himself and his management and consultant cohorts of 50% of the total consideration to be received by FOXO shareholders, on a $200,000,000 total transaction consideration.. It was later learned through public filings, that Sabes was personally granted over 35% of such plan shares (*i.e.*, 3,507,000 shares at approximately $10.14/share) valued at $35,560,980 at the time of grant.

30.52.  Sabes also failed to disclose that the subsequent investors would not have their shares subject to a lock-up agreement.  He also failed to advise Smithline that the SPAC (which initially had $201,000,000 in trust) was not required to deliver such cash to the merged company.  Rather, and unbeknownst to Smithline, only a paltry $10,000,000 had been committed to be delivered by the SPAC sponsor group.

31.53.  Once again, Sabes also failed to disclose the ongoing SEC investigation and litigation relating to his tenure at GWG Holdings., even though Article III, Section 3.1(j) of the SPA (as un-amended by the Amendment) specifically required that he disclose whether the Company had knowledge of any pending or contemplated investigation by the SEC "involving" FOXO, or any current or former officer or director of FOXO—such as the GWG investigation which involved Sabes (the company's founder, Chairman and CEO during the time of the investigation).

54.     Sabes also failed to disclose (and the terms of the Amendment did not include) the terms of a side letter that provided special preferential undisclosed terms to an investor in the second debenture offering, i.e., giving it additional undisclosed shares in conjunction with its investment in the second debenture offering, which further diluted the Debentures and Warrants purchased by Smithline and other investors and which entitled them to additional shares upon

**Formatted:** Font color: Text 1

conversion of their Debentures or exercise of their Warrants.  Had this side letter been disclosed at the time and had FOXO abided by the terms and protections in the Financing Documents and recognized such dilutive issuance, it would have severely diluted the shares of Sabes and his cohorts, and would have potentially derailed the Delwinds transaction.

55.    The SPAC was announced on February 24, 2022.  Smithline did was not become aware of provided any of the foregoing information until the SPAC transaction was publicly announced.

32.56.  These were intentional, willful, and material omissions and misrepresentations by Sabes, the then Chairman of the Board and CEO of FOXO, but for which Smithline, and likely other investors, would not have approved and signed the Amendment.  As a result of the omissions, Sabes was able to complete the SPAC, and obtain the benefit of the 35% share grant for himself at the expense of FOXO shareholders, who were initially entitled to such shares.

33.57.  After the announcement, it became clear that the reason Sabes was able to negotiate for himself (and his cohorts) such an attractive deal with Delwinds was because Delwinds was not committing to delivering financing, other than its sponsors' relatively minimal commitment to invest an additional $10,000,000 in the transaction at its closing if there was not $10,000,000 in the trust at such time. Notably, Delwinds was approaching its expiration date at which time its sponsor group sponsors would have had to redeem the trust and give, return the money back to shareholders, and lose their investment in Delwinds, putting the sponsor group's $6,325,000 investment in Delwinds at risk of a complete loss.

**FOXO's Post-SPAC Announcement Misconduct**

34.58.  In July 2022, Smithline learned, from the Delwinds Form 8-K, that FOXO would be permitted to pay issue $1,425,000 million in cash as well as issue 1,500,000 shares of FOXO

Class A common stock to an existing stockholder, Bespoke Growth Partners, Inc. ("Bespoke"), as consideration for certain alleged services, *e.g.*, "advisory services relating to the implementation and completion of an event that will result in the Company being publicly listed and subject to Exchange Act" despite the subject transaction being very close to completion at the time.

~~35.~~59.  Based on the receipt of such shares, Bespoke became, according to the proxy statement ~~and /~~ prospectus, a Related Party to FOXO and resulted in certain disclosures~~, which were~~ becoming legally required to be made in the proxy statement ~~and /~~ prospectus.  Although Smithline questioned FOXO, FOXO's counsel, Andrew Poole and SPAC counsel ~~about~~ as to such ~~disclosure, these~~ disclosures, those, as well as other required disclosures, were not made by either FOXO or Delwinds in their respective public filings. ~~ Upon information and belief, making~~ prior to the merger with the SPAC being closed.  Making such disclosures at such time would have risked (i) further delay in the SPAC transaction that at that time had been cleared by the SEC, (ii) potentially increased scrutiny by the SEC of the deal, and (iii) the ~~need~~ possibility of having to obtain a new consent from Debenture investors, including Smithline, who with knowledge of these previously undisclosed facts would almost certainly not have given such consent as previously provided. Several of those disclosures were later made after the closing of the merger in publicly filed FOXO documents.

~~36.~~60.  At Sabes' instructions, Bespoke's principal, Mark Peiken ("Peiken~~"),~~") met with Smithline in-person in New York twice, advised Smithline that he had acted as special counsel to FOXO's attorneys, ~~Mitchell Silberberg & Knupp, LLP ("~~MSK~~"),~~, and had fee sharing arrangements with the law firm. This potential conflict of interest, along with litigation ~~relating to~~ brought by the SEC against one of Bespoke's principals as a Related Party, should have been

- 19 -

disclosed to investors in the proxy statement and /prospectus.  Just prior to the closing of the SPAC merger, Sabes arranged to pay Bespoke's astronomicalBespoke a fee of $8,500,000, comprised of $1,425,000 in cash and 1,500,000 shares of FOXO common stock.  When questioned by Smithline and his son about the $1,425,000 cash fee, Peiken noted that he received that as payment of expense advancement and banking fees associated with the second debenture round (which took place prior to his allegedly entering in the consulting agreement with FOXO). Based on the terms of the Debenture and the Warrant, the issuance of shares to Bespoke was a dilutive issuance and should have decreased the conversion price of the Debentures and the exercise price of the Warrants and increased the number of shares to be received by holders upon exercise of the Warrants.  However, had FOXO abided by the terms and protections in the Financing Documents and recognized such dilutive issuance, it would have severely diluted the shares of Sabes and his cohorts, including Andrew Poole and Peiken, and couldwould have potentially derailed the merger with Delwinds. transaction.

37.61.   NeitherHowever, neither FOXO nor its attorneys sent the required notice of this dilutive issuance to Smithline (or, upon information and belief, other Debenture or Warrant holders).  FOXO also refused to provide details of other potentially dilutive issuances (including one mentioned below) when requested multiple times by Smithline.

38.62.   On behalf of FOXO, MSK opined that the issuance of shares to Bespoke was not dilutive, while failing at the same time, failed to disclose Peiken's relationship with MSK or other material items required to be disclosed in the proxy statement and prospectus.S-4.  MSK also failed to provide evidence of other dilutive issuances when requested by Smithline in writing to provide a list of all equity issuances subsequent to the Debenture deal.  Delwinds also failed to make such required disclosures in the proxy statement or/ prospectus relating to the

SPAC merger. Peiken's relationship with MSK was subsequently disclosed after the closing of the SPAC merger in later FOXO public filings.

**Formatted:** Font color: Auto

39.63.   The Bespoke giveaway, upon information and belief, was memorialized in a "consulting agreement" that was not publicly disclosed in the proxy statement or prospectus relating to the SPAC merger.  Therefore, it is unclear if the shares given to Bespoke were, or were not, encumbered by a lock-up agreement enabling Bespoke to exit the share grant while other investors, like Smithline, would still be prohibited from selling their shares.

40.64.   Sections 5(b) of the Debenture and Section 3(b) of the Warrant, each contain contained anti-dilution provisions prohibiting such dilutive issuances, and require that, if such issuances are were made by FOXO, the conversion price of the Debenture and the exercise price on the Warrants must be reduced to the price of the dilutive issuances, and the number of warrant shares to be received by holders on exercise of the Warrants would be increased.

41.65.   The share giveaway to Bespoke constituted a dilutive issuance under the Debenture and the Warrant.  Although Smithline repeatedly raised this issue to Sabes and, other members of FOXO management, FOXO's attorneys, the SPAC sponsor, Andrew Poole, and to SPAC counsel, FOXO improperly refused to acknowledge it, or to take the action required of it under those agreements.  Namely, FOXO was obligated required to reduce the conversion share price on the Debenture Smithline and others' FOXO Debentures and the exercise price of the Warrant their Warrants, and to increase the number of warrant shares to be received by holders on exercise of the Warrants, which would have further required FOXO to issue them additional shares at that price upon conversion of the Debentures or exercise of the Warrants.

42.66.   Acknowledging that the Bespoke fee was, in part, a the dilutive issuance would have significantly diluted the share holdings of Sabes and his cohorts, including Bespoke and

Andrew Poole and the other members of the sponsor group of Delwinds, ~~which~~all of whom received inordinate economic advantages in the transaction and would have made the consummation of the SPAC transaction for all intents and purposes impossible.

67.     The Bespoke giveaway was not the only dilutive issuance that occurred.

68.     FOXO, in its S-1 dated February 10, 2023, disclosed that, in connection with the sale of the 2022 second round of debentures, FOXO also entered into a letter agreement between itself and an institutional investor (the "Bridge Investor").

69.     Under the agreement with the Bridge Investor, FOXO agreed to issue the Bridge Investor, in addition to the debenture and warrants to be received by other investors, 602,578 shares of FOXO Class A Common stock to be issued immediately prior to the closing of the SPAC, which would be exchangeable into 350,000 shares of post-SPAC Class A Common stock. The result of the agreement with the Bridge Investor was that the Bridge Investor received an additional 602,578 shares of FOXO Class A Common stock, which was then exchanged for 350,000 shares of post-SPAC Class A Common stock.

70.     This arrangement constituted another dilutive issuance under the Debenture and Warrant.  The Bridge Investor purchased the 2022 debentures and associated warrants on the same terms as the other investors, but received extra stock worth $3,500,000, further diluting the value of Smithline's shares.  FOXO was required to disclose these terms in "reasonable detail" under Section 4.12 of the SPA, giving Smithline and others the right to participate in such offering on such terms, *i.e.*, "participation rights," but did not do so, thereby breaching its obligation under Section 4.12 of the SPA, which constituted an Event of Default under Section 8(a)(ii) and/or (iii) of the Debenture. In addition, there was no disclosure of the extra stock giveaway to the Bridge Investor in the Amendment.  This material omission further tainted the

obtaining of the Amendment, including through making untrue FOXO's representation in Section 2(b)(iii) of the Amendment, i.e., that FOXO's performance of the transactions contemplated in the Amendment would not amount to default of, or an event of default under, any other agreement.

71.   Around the same time, based on a June 24, 2022 *Wall Street Journal* article, Smithline further learned for the first time that FOXO had made misrepresentations about litigation and SEC investigations involving its officers and directors.  The *Journal* article stated. that Sabes' prior company GWG Holdings was subject to an SEC investigation and lawsuits from investors based on breaches of fiduciary duty and fraud for activities taking place during Sabes' tenure as Chairman and CEO of GWG Holdings.  It was stated in the.  The article further noted that "many investors were unaware that as its core life-settlement business failed, GWG Holdings would transfer hundreds of millions of dollars into startup ventures created by the company's former leaders", including Sabes.

43.72.  The SEC investigation had been ongoing since October 2020, in other words, before Puritan entered into the SPA with FOXO that represented.  The SPA, which Sabes signed on FOXO's behalf, had covenanted that no such investigation involving any of its officers or directors is or was ongoing, a representation that was subsequently maintained by Sabes and FOXO.  Finally, Delwinds' proxy statement and prospectus alsoS-4 disclosed the litigation relating to GWG Holdings for activities which took place during Sabes' tenure as Chairman and CEO.  JGUN and Peiken advised Smithline that there was much consideration given to replacing Jon Sabes as CEO of FOXO at such time due to his conduct, especially in light of FOXO's operating in the heavily regulated insurance industry and having insurance companies as investors, but it was ultimately decided not to replace him at such time..

44.73.  By September 2022, Smithline learned from Peiken that the SPAC investors largely intended to redeem their money from the SPAC's trust and not invest in the transaction.

45.74.  Making matters worse, although they had been touted as the financial advisors to FOXO and Delwinds, two major investment banks, RBC Capital Markets and Deutsche Bank, on June 8, 2022 and June 16, 2022, respectively, walked away from the SPAC deal before it closed, despite having completed their work, foregoing and having to forego $12,600,000 in fees.  The proxy statement and prospectus disclosed that neither RBC Capital Markets nor Deutsche Bank nor RBC wanted their names and reputations associated with the disclosures (or lack thereof) or the underlying business analysis relating to the transactions and used to pitch them to investors such as Smithline.  It should be noted that despite the robust projections being used to solicit investors and the representations made by Sabes, FOXO had recorded revenues of a paltry $79,000 for the first half of 2022.  The $79,000 of revenues during this period was a far cry from the $150,000,000 of revenues that FOXO had projected to investors in connection with the SPAC transaction that it would generate for 2023.  Smithline emailed to FOXO, its counsel, Andrew Poole and SPAC counsel, and informed them that it appeared that the economic interests of the remaining participants completing the transaction trumped the concerns mentioned by RBC Capital Markets and Deutsche Bank and RBC regarding FOXO's disclosures (or lack thereof) or the underlying analysis relating to the transaction.

46.75.  After RBC Capital Markets and Deutsche Bank and RBC backed away from the deal, JGUN, the sole remaining investment bank involved (other than Bespoke), and which was acting on behalf of FOXO, then approached Smithline soliciting further investment into FOXO in exchange for removing the lock-up on the original shares underlying the Debentures and Warrants.  As the Amendmentamendment had not been properly obtained, such lock-up should

not have applied to Smithline and the other investors in the initial Debenture round in any event.. That the primary sales incentive of this capital raise was to eliminate the lock-up on the prior investment, was an indication that FOXO—despite public pronouncements to the contrary by its CEO and Board members—knew the value of its shares would imminently plummetdecline and werewas thus collecting ransom from its early investors for something they should have otherwise had already (i.e., the rights to sell their shares) in before the stockshare price collapsed.

47.76.  Smithline did not participate in this additional financing.

77.     Around the same time, Smithline's representatives met with FOXO and Sabes' agent Peiken, FOXO's "consultant" at the Westchester, New York airport, and.

48.78.  There, Peiken admitted that Sabes had been untruthful and made misrepresentations and had been negotiating against the Company's interest for his own benefit in orchestrating the SPAC deal.  Peiken stated that he was "terribly sorry for all of this sh*t we had to deal with here-".  He noted that he was uncomfortable with Sabes' lack of veracity, stating "Jon seems to have a problem with the truth."  Peiken explained that he would not have invested $1,500,000 into FOXO had he known about the litigation involving Sabes at the time of the investment, and that he understood that Smithline's representatives had "significant concerns". He also mentioned that SPAC counsel was concerned as to whether the answers to the questions Smithline's representatives had raised would have to be disclosed in the proxy statement and prospectusS-4, which had already been declared effective.  Making such disclosures could have delayed and possibly derailed the transaction.  Such disclosures were not made until after the transaction closed in subsequently filed FOXO documents.

49.79.  In the course of their discussions, Peiken, told Smithline's representatives that he understood why Smithline would not invest further in FOXO in order to get liquidity on their

- 25 -

shares, but that he held freely tradable shares that were not subject to a lock-up agreement, and

tried to convince Smithline's representatives that the investment banks had resigned as a

courtesy to save fees because they owed the SPAC's principals a favor from another deal.  In

addition, as compensation for the wrongdoing they had suffered, Peiken offered R. Smithline's

son a seat on FOXO's Board of Directors, and offered Smithline's representatives a consulting

agreement from FOXO or some of Peiken's free-trading stock.  Smithline's representatives

rejected these proposals.

50.80.  Meanwhile, shortly before the closing of the merger, on September 13, 2022,

Delwinds entered into a forward purchase agreement whereby Meteora Capital Partners, LP

("Meteora") would purchase up to 3,000,000 shares of its common stock in the market and sell

them to FOXO with its returns guaranteed by funds (*i.e.*, $29,135,330) of FOXO held in escrow.

51.81.  The result of this agreement allowed the SPAC's sponsors, Andrew Poole and his

colleagues, including upon information and belief, The Gray Insurance Company, at the

significant expense of FOXO and its shareholders, to avoid making further investment in FOXO,

which they had otherwise been required to make when 99.5% of SPAC shareholders redeemed

their shares and $10,000,000 was not left in trust in the SPAC.  Andrew Poole and his

colleagues, including upon information and belief, The Gray Insurance Company, later entered

into another self-serving agreement with FOXO to release their locked-up shares earlier than

originally contemplated. Yet the message given by Andrew Poole to the public in a FOXO press

release dated September 16, 2022 was different: "[h]aving had the opportunity to work closely

with the FOXO team these past months, our belief in FOXO's value proposition and market

opportunity have only grown."

52.    FOXO and Delwinds consummated its merger on September 15, 2022, and shares of the merged company began trading under the symbol "FOXO" on the NYSE American on September 16, 2022.

53.    On November 11, 2022, Meteora and the Company "mutually terminated" the forward purchase agreement, upon which Meteora was allowed to retain 500,000 shares of common stock and the escrow agreement was terminated, further damaging investors.

54.    Another of the Company's financing parties, CF Principal Investments LLC (the "Cantor Investor") , an affiliate of Cantor Fitzgerald & Co., "mutually terminated" its common stock purchase agreement with the Company, pursuant to which the Company had the right to sell to the Cantor Investor up to $40 million of shares of common stock for a 36-month period, for which the Cantor Investor received 190,476 commitment shares of common stock on September 16, 2022.

55.82.  Ultimately, none of the representations about FOXO's viability proved true, whether as to litigation and regulatory investigations, dilution of shares, growth projections, or profits.  Upon consummation of the merger, 99.5% of the SPAC investors redeemed their shares draining Delwinds of most of its cash and FOXO's stock traded down from $10.14 per share to less than $2.00/share in only eight days.

56.83.  As of November 17December 27, 2022, FOXO's stock price closed attraded as low as $0.4423 per share, a 95.6 97.7% decline.

57.84.  Upon closing of the Merger, according to FOXO's calculations, the outstanding amount due under the Debenture was $2,336,937.  Pursuant to the ill-gotten Amendment, the Debenture was required to be converted into 647,774 shares of FOXO according to the Letter of Transmittal of FOXO's Transfer Agent sent to Smithline (which required Smithline to sign a

release of FOXO to get its~~their~~ shares).  Based on the value of the common shares at closing (approximately $10.14/share), the value of the shares to be delivered at closing to Smithline was to be approximately $6,568,428. Smithline's Warrants to purchase 181,685 shares of FOXO at $6.21/share (each, as adjusted for the merger) were thus in the money at closing by a total of $714,022. ~~This $7,282,450 of value to be delivered at closing to Smithline quickly evaporated.~~

~~58.~~85.  Instead of receiving these substantial profits, Smithline and the original Debenture investors were left to face the extreme, devastating consequences of these financial losses while the subsequent investors, who were not subject to the lack of disclosure and lock up agreement, were able to exit ~~their positions.~~  Sabes was able to receive his outsized payments in the transaction (including a share grant pursuant to the management share plan valued at in excess of $35,560,980 at the time of grant), Bespoke its $8,500,000 giveaway ~~of~~ cash and shares, and Andrew Poole and his colleagues, including upon information and belief, The Gray Insurance Company, were able to save their $6,325,000 investment in Delwinds without investing more money in the merger transaction – all at the expense of FOXO shareholders including  Smithline.

86.      ~~Effective as of~~On November 14, 2022, ~~a mere two months after the consummation of the merger, as the Company continued to unravel.  Jon Sabes was~~FOXO terminated Sabes as CEO and Chairman of the Board ~~(while remaining as a Director) and his~~, claiming in its S-1 that it had lost confidence in Sabes' ability to act in an executive officer capacity following the Merger.

~~59.~~87.  According to the S-1, "other senior executives" of FOXO had advised the Board they would resign unless Sabes was replaced.  FOXO's Chief Product Officer had already resigned, citing strong disagreement with the direction FOXO was taking.  FOXO's board of directors determined to terminate Sabes' brother Steven Sabes ~~was terminated as COO. The~~

~~Company's Chief Technology Officer was appointed as interim CEO while the Company commenced a search process to identify its new CEO.~~ as Chief Operating Officer due to the board's view that Steven Sabes was not sufficiently fulfilling his responsibilities in such position.

~~60.     Due to the disarray caused by FOXO and Sabes's activities, the Company was unable to timely file its 10-Q for the quarter ending September 30, 2022.~~

88.     Approximately two months later, Sabes resigned from FOXO's Board of Directors.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Breach of Contract-Against FOXO)

~~61.~~89.   Smithline repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

~~62.~~90.   Smithline and FOXO were parties to the Financing Documents.

~~63.~~91.   The Financing Documents were enforceable written contracts as between Smithline and FOXO.

~~64.~~92.   Smithline fully-performed under the Financing Documents and provided $1,000,000 to FOXO.

~~65.~~93.   FOXO breached the Financing Documents when it:

    a.   Failed to disclose that FOXO's ~~then~~ Chairman of the Board and CEO, Sabes, was involved in litigation and an SEC investigation, pursuant to Section 3.1(j) of the SPA and as of the date Smithline agreed to the Amendment.

    b.   Failed to disclose the self-serving management share plan as of the date Smithline agreed to the Amendment.

    c.   Failed to disclose that the second round of debenture shares were not locked up when Smithline agreed to the Amendment.

- 29 -

Formatted: Underline

d.   Failed to disclose the favorable terms offered to the Bridge Investor and offer such terms to the Debenture holders, including Smithline.

d.e. Failed to disclose the SPAC was not required to deliver in excess of $10 million of cash as of the date Smithline agreed to the Amendment.

e.f. Made an at least two improper dilutive issuanceissuances pursuant to Section 5(b) of the Debenture and Section 3(b) of the Warrant.

f.g. Failed to amend the conversion price of the Debentures and the exercise price and number of shares to be received upon exercise of the Warrants based upon the dilutive issuanceissuances and to issue the additional shares to which Smithline was thereby entitled pursuant to Section 5(b) of the Debenture and Section 3(b) of the Warrant.

g.h. Failed to repay or redeem the Debenture pursuant to Section 8(b) of the Debenture.

h.i. Failed to purchase the Warrant at the Black Scholes Value pursuant to Section 3(e) of the Warrant.

66.94.  Smithline's $1,000,000 investment has been substantially injured by FOXO's multiple breaches of the Financing Documents.  But for the ill-gotten Amendment, (i) there would have been an Event of Default under the Debentures ($2,336,937 outstanding as of the closing date of the merger) that would have made them due and payable at the Mandatory Default Amount (*i.e.*, the sum of (a) 130% of the outstanding principal amount of this Debenture, plus (b) 130% of accrued and unpaid interest hereon and (c) 130% of all other amounts, costs, expenses and liquidated damages due in respect of the Debenture) or $3,038, 018, plus accrued default interest and late fees each at 18% accruing from the date of the merger to the date of

- 30 -

~~repayment~~ in accordance with its terms and (ii) the Warrants would have been required to be purchased by FOXO at the Black Sholes Value thereof (a value to Smithline of $2,406,731, without giving effect to the dilutive issuance~~,~~ or $3,168,750 ~~, with~~ by giving effect to the dilutive issuance's impact on the exercise price of the warrants~~.~~ but not the increase in the number of shares in the anti-dilution provisions of the Warrant).

~~67.~~95.  The value of Smithline's FOXO's stock and warrants, which were anticipated to deliver substantial profits to Smithline (the stock's value at the closing of the merger was approximately $6,568,428 and the warrants were $714,022 in the money at such date ~~for a total aggregate value of $7,282,450~~), even more so if the dilutive issuance had been properly recognized, and which would have been not subject to the lock-up and freely salable at closing but for the ill-gotten consent, has been eviscerated with the ~~95.6~~97.7% decline in value of the stock since the merger.

~~68.~~96.  As a result, Smithline has been damaged in an amount to be determined at trial, but estimated to be in excess of a minimum of $6,206,768 (~~i.e., the amount that the Debenture and Warrant – without giving effect to the dilutive issuance's impact to the number of shares to be purchased thereunder – should have been required to be purchased at the consummation of the merger),~~ plus accrued interest and late fees under the ~~Debenture~~Notes, each at 18% ~~until~~from the date of ~~repayment.~~the merger).

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Unjust Enrichment – Against FOXO and Sabes)**

~~69.~~97.  Smithline repeats and re-alleges each and every allegation set forth above as if more fully set forth herein.

~~70.~~98.  Smithline fully-performed all acts that FOXO requested it perform in connection with the Financing Documents and the SPAC merger, and invested $1,000,000 in FOXO.

71.99.  FOXO and Sabes made numerous misrepresentations and material omissions to Smithline and provided inaccurate, misleading information all while FOXO, and Sabes and his cohorts, benefitted from Smithline's performances in connection with the Financing Documents and the SPAC merger.  FOXO has retained the value of that benefit—Smithline's financing of FOXO's transaction—without compensating Smithline for its fair value or the consequences of its misrepresentations and omissions, without which Smithline would not have entered into the financing transaction and subsequent Amendmentamendment with FOXO and FOXO would not have been able to enter the SPAC merger without repaying or redeeming the Debentures and repurchasing its Warrants.

72.100.      In light of the benefit FOXO, and Sabes, received, it would be against equity and good conscience to permit FOXO, and Sabes, to retain the benefits conferred by Smithline, particularly in light of the misleading and materially omitted statements FOXO used to obtain and induce receipt of those benefits.

73.101.      Smithline has been damaged by FOXO's unjust retention of the financial benefits of Smithline's investment.

74.102.      Accordingly, FOXO and Sabes have been unjustly enriched, and Smithline has been damaged, in an amount to be determined at trial, but estimated to be in excess of a minimum of $6,206,768 (i.e., the amount that the Debenture and Warrant—without giving effect to the dilutive issuance's impact to the number of shares to be purchased thereunder—should have been required to be purchased at the consummation of the merger), plus accrued interest and late fees under the DebentureNotes, each at 18% untilfrom the date of repayment. the merger).

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Fraud – Against FOXO and Sabes)**

75.103.    Smithline repeats and re-alleges each and every allegation set forth above as if more fully set forth herein.

76.104.    FOXO and its representatives, including Sabes, falsely represented to Smithline that its officers were not involved in litigation or SEC investigation, materially omitted to advise Smithline that the SPAC transaction contained numerous self-dealing provisions including the management share plan, materially omitted to advise Smithline that the second round debenture investors were not locked up when soliciting Smithline's consent and agreement to the Amendment, materially omitted to advise Smithline that the SPAC (through its sponsor group) was not delivering more than $10 million to the merged company and materially omitted to recognize the dilutive issuance issuances to Bespoke and the Bridge Investor which would have entitled Smithline to significantly more shares.

77.105.    Smithline justifiably relied on these misrepresentations and omissions of fact in deciding to enter into the Financing Documents and to invest $1,000,000 in FOXO and to enter into the Amendment.

78.106.    In fact, FOXO and Sabes always intended to make these misrepresentations and material omissions in order to induce Smithline's investment in FOXO, and its execution of the Financing Documents, and Amendment permitting the SPAC transaction.

79.107.    FOXO and Sabes had full knowledge of their misrepresentations and material omissions of fact, and intended to induce Smithline's investment and Amendment and cooperation thereby.

80.108.    Accordingly, as a result of FOXO and Sabes's Sabes' fraudulent conduct, Smithline has been damaged, in an amount to be determined at trial, but estimated to be in excess

- 33 -

Formatted: Centered

of a minimum of $6,206,768 (i.e., the amount that the Debenture and Warrant—without giving effect to the dilutive issuance's impact to the number of shares to be purchased thereunder—should have been required to be purchased at the consummation of the merger), plus accrued interest and late fees under the DebentureNotes, each at 18% untilfrom the date of repayment. the merger).

   **WHEREFORE**, Smithline demands judgment as follows:

   (a)   On the First Cause of Action, in favor of Smithline and against FOXO, damages in an amount to be determined at trial, estimated to be in excess of a minimum of $6,206,768. (plus accrued interest and late fees under the DebenturesNotes, each at 18% untilfrom the date of repayment;the merger);

   (b)   On the Second Cause of Action, in favor of Smithline and against FOXO and Sabes, damages in an amount to be determined at trial, estimated to be in excess of a minimum of $6,206,768. (plus accrued interest and late fees under the DebenturesNotes, each at 18% untilfrom the date of repayment;the merger);

   (c)   On the Third Cause of Action, in favor of Smithline and against FOXO and Sabes, damages in an amount to be determined at trial, estimated to be in excess of a minimum of $6,206,768. (plus accrued interest and late fees under the DebenturesNotes, each at 18% untilfrom the date of repayment; the merger);

   (d)   For costs and disbursements in this action, including attorneys' fees;

   (e)   For such other and further relief as the Court deems just, equitable and proper under the facts and circumstances of this case.

Dated: New York, New York
       November 18, 2022

       February 22, 2023

- 34 -

SICHENZIA ROSS FERENCE LLP

By:_____ /s/ *Sameer Rastogi*   *Owen A. Kloter*_____

Sameer Rastogi, Esq.
Owen A. Kloter, Esq.
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
(212) 930-9700
okloter@srf.law

*Attorneys for Plaintiff Smithline Family Trust II*

Formatted: Indent: Left: 3"

## VERIFICATION

STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF NEW YORK   )

  Richard Smithline, being duly sworn, deposes and says that he has read the foregoing Verified Complaint, and knows the contents thereof, and that the same is true to his knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters, he believes them to be true.

_____
Richard Smithline,
Authorized signatory, Smithline Family Trust II

Subscribed and sworn to before me
this 18th day of November 2022

_____           NOTARY PUBLIC

**Formatted:** No Spacing, Left, Indent: Left:  3", Pattern: Clear

**Formatted:** Font: Times New Roman, 12 pt, Italic, Font color: Text 1

- 36 -